# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

―――――――――――

Nº 14-CV-1076 (JFB)

―――――――――――

STEVEN MESZAROS,

Movant,

VERSUS

UNITED STATES OF AMERICA,

Respondent.

―――――――――――

**MEMORANDUM AND ORDER**
August 15, 2016

―――――――――――

JOSEPH F. BIANCO, District Judge:

In July 2008, a federal jury found Steven Meszaros (hereinafter, "Meszaros") guilty of wire fraud and conspiracy to commit wire fraud. On April 22, 2009, this Court sentenced Meszaros to a prison term of 151 months. Meszaros, who remains incarcerated, moved pursuant to 28 U.S.C. § 2255 to vacate, correct, or set aside his sentence. This Court ordered an evidentiary hearing on the limited issue of whether Meszaros received effective assistance of counsel as to advice he was given by his trial attorneys, Stephen Scaring (hereinafter, "Scaring") and Matthew Brissenden (hereinafter, "Brissenden"), with respect to plea offers made by the government. The evidentiary hearing took place over two days on February 22 and March 14, 2016.

For the reasons stated below, Meszaros's Section 2255 petition is denied in its entirety. In particular, Meszaros claimed the following in his Section 2255 petition: (1) he was under the mistaken belief throughout from his attorneys that his maximum statutory sentencing exposure was 60 months in jail (*see* Meszaros Mot. to Vacate ¶ 21, ECF No. 1 (14-cv-1076)[1] ("Even at sentencing . . . the Movant was under the impression that his sentence was limited by statute to 5 years.")); (2) he never knew (a) about a possible plea offer from the government of 51 to 63 months in jail in exchange for a guilty plea to the Superseding Indictment (*see* Movant's Reply Aff. ¶ 15, ECF No. 7 (14-cv-1076) ("Further, I was never aware of a term of imprisonment of five . . . years that had apparently been discussed between the government and my attorney until I read about it in the

―――――――――――

[1] The parties have filed their submissions pertaining to the instant motion on both Meszaros's criminal docket, No. 06-cr-503, and the civil docket opened for his Section 2255 petition, No. 14-cv-1076. Where necessary to avoid confusion, the Court shall distinguish to which docket it is citing.

government's response to my 2255 Motion. This is yet another instance of my attorney's ineffective assistance of counsel in my case.")), or (b) that the government's projected Guidelines range was 235 to 293 months' imprisonment on the Superseding Indictment if he were convicted at trial (*see also* Hr. Tr.[2] at 234 (denying knowledge of government's Guidelines calculation if he were convicted at trial on the Superseding Indictment)); (3) Scaring and Brissenden did not properly advise him regarding any recommendation as to whether he should take a guilty plea; and (4) had he been aware that he would be sentenced to 151 months of imprisonment, much less had he known that he faced a potential prison sentence of 235 to 293 months if found guilty at trial, he would have accepted the government's plea offer of 51 to 63 months.

Having conducted an evidentiary hearing, including an assessment of the credibility of the witnesses, the Court makes several findings with respect to Meszaros's claims. First, the Court finds that the following sworn statements by Meszaros are false: (1) that he believed throughout the case, until sentencing, that his maximum statutory exposure was five years; (2) that a potential 51- to 63-month plea offer made in connection with the Superseding Indictment was not communicated to him; and (3) that the government's Guidelines assessment of 235 to 293 months in jail, if he were to be convicted at trial, was not communicated to him during a reverse proffer with the government held on May 2, 2007.

The Court bases these findings on the overwhelming credible evidence presented by the government at the evidentiary hearing

including, *inter alia*, the following: (1) the credible testimony by Meszaros's first attorney, Steven Brill (hereinafter, "Brill"), who testified that he told Meszaros that he faced in excess of ten years imprisonment if the government filed a Superseding Indictment charging him with both the first fraud Meszaros perpetrated between 1999 and 2001 using a company called Nexus Asset Management, L.L.C. and its successor, Livestreet, L.L.C. (hereinafter, referred to as the "Nexis/Livestreet fraud") and the second fraud committed by Meszaros between 2003 and 2007 using a company called the Penta-Cycle Group (hereinafter, referred to as the "Penta-Cycle fraud") (Brill's testimony is supported by a contemporaneously-recorded note, which indicated, under a heading titled, "explained to client," that, if a Superseding Indictment were returned, Meszaros would be exposed to over ten years in jail (*see* Resp't's Ex.[3] 3)); (2) the credible testimony by Brissenden, who testified that during the May 2007 reverse proffer meeting (attended by Meszaros), he had "no doubt" that: (a) the 24- to 30-month plea offer for the Nexus/Livestreet fraud, as well as the 51- to 63-month plea offer for the Nexus/Livestreet fraud and the Penta-Cycle fraud, were both conveyed to Meszaros, and (b) the government's calculated Guidelines range of 235 to 293 months' imprisonment for a conviction on both frauds after trial was discussed with Meszaros (the discussion of the government's Guidelines range is corroborated in a memorandum prepared by Brissenden to Scaring summarizing the meeting); (3) the credible testimony by Scaring, who stated that he never told Meszaros that it was not possible for him to receive a sentence of greater than five years on the charges; (4) the credible testimony by

---

[2] "Hr. Tr." refers to the transcript from the evidentiary hearing held on February 22 and March 24, 2016.

[3] All citations to "Ex." refer to the exhibits moved into evidence during the evidentiary hearing.

Assistant U.S. Attorney, Allen Bode (hereinafter, "AUSA Bode") that, at the May 2007 reverse proffer, he discussed with Meszaros and his attorney the 51- to 63-month potential plea offer for both frauds, as well as the 235- to 293-month maximum sentence under the Guidelines Meszaros faced if he went to trial on both frauds and were convicted (AUSA Bode's testimony is corroborated by notes he prepared to be used at the meeting); and (5) the credible testimony by Investigator James Cox (hereinafter, "Investigator Cox"), a criminal investigator with the U.S. Attorney's Office, that, during a meeting in January 2007, Investigator Cox specifically recalls telling Meszaros that his exposure for both frauds could exceed seventeen years if he were convicted at trial. The incredible contention by Meszaros that he believed even right up to his sentencing that his maximum statutory exposure was only five years is further belied by the fact that, immediately following the jury's verdict, the government sought to revoke his bail and stated, on the record, *in Meszaros's presence*, that Meszaros's sentencing exposure under the Guidelines was "in the neighborhood of fifteen years." (Resp't's Ex. 9.)

The Court also finds that defense counsel adequately advised Meszaros regarding whether or not he should plead guilty. In particular, through the meetings with the government and independent discussions between Meszaros and his defense counsel, Meszaros was certainly aware of (1) the strength of the evidence against him; and (2) the possible sentence of incarceration that could be imposed after a guilty plea as opposed to a verdict after trial. More specifically, the Court credits the testimony of both Scaring and Brissenden that they met with Meszaros specifically to show him the strength of the government's case, as well as the corresponding weaknesses or pitfalls in

his position. Although defense counsel may not have made an explicit recommendation that he should take the government's plea offer, the Court concludes that the failure to do so was not ineffective in this particular case, in light of Meszaros's adamant insistence throughout the case that he was innocent, as well as the other efforts that were made by defense counsel to make Meszaros aware of the strength of the government's case and the risks of going to trial.

Finally, the Court finds that, even if Meszaros had received all the factual information and legal advice that he now claims was lacking, he would not have admitted his guilt and accepted a plea offer of 51 to 63 months. The Court finds credible Scaring and Brissenden's testimony that Meszaros has adamantly maintained his innocence and would not even consider a guilty plea. That testimony aligns with this Court's observations of Meszaros's demeanor throughout this case, including at trial and sentencing. In fact, at the evidentiary hearing, when asked whether he would have accepted a plea of 51 to 63 months if he knew he faced a sentence of 253 to 293 months, Meszaros responded, "I would have had no choice." (Hr. Tr. 95.) That response is consistent with the Court's finding that, even to this day, Meszaros does not believe he committed a crime and could never have allocated to doing so. Thus, the Court concludes that, even if defense counsel explicitly and strongly recommended that he take a plea offer of 51 to 63 months and even knowing that he faced a potential sentence of 253 to 293 months under the Guidelines (which the Court finds was communicated by the Government to Meszaros), there is no reasonable likelihood that Meszaros would have accepted a guilty plea and acknowledged his guilt under the particular circumstances of this case.

Accordingly, having failed to demonstrate either ineffective performance or prejudice, Meszaros's Section 2255 petition is denied in its entirety on the merits.

## I.    FACTUAL BACKGROUND

Meszaros was arrested in March 2006 in connection with his involvement between 1999 and 2001 in the Nexis/Livestreet fraud. Shortly after the arrest, Meszaros was indicted on charges of wire fraud and conspiracy to commit wire fraud. Meszaros retained Brill to represent him. (Hr. Tr. 7:22-24.)

In January 2007, Brill attended a reverse proffer meeting with AUSA Bode and Investigator Cox. (Hr. Tr. 100:18-101:7.) Meszaros asserts that he did not attend this meeting (Hr. Tr. 224:1-6), though AUSA Bode and Investigator Cox both testified that Meszaros was there (Hr. Tr. 236:10-13; 245:4-14); Brill believed, but was not certain, that Meszaros was present (Hr. Tr. 101:1-10). However, the parties agree that during the reverse proffer, the government offered Meszaros a plea agreement, whereby he would plead guilty to the Nexus/Livestreet fraud in exchange for a two-year sentence and restitution of approximately $300,000.[4] (Hr. Tr. 55:25-56:4.) They also discussed the government's ongoing investigation of the Penta-Cycle fraud, and the government indicated that it was considering seeking a Superseding Indictment that would incorporate charges related to this scheme.[5] (Hr. Tr. 237:5-13.)

At some point after the reverse proffer, Brill prepared a document titled "Meszaros Plea Offer (as of March 29)." (*See* Resp't's Ex. 3.) It contains two headings: first, "plea to mail fraud," and second, "explained to client." (*Id.*) Under the first heading, Brill outlines the calculation of the 24- to 30-month Guidelines range for the Nexus/Livestreet fraud (e.g. "Money Amount = +4," "Special Skill = +2"). (*Id.*) Under the "explained to client" heading, Brill makes reference to the anticipated Superseding Indictment and writes "may be detained if superced[ing] indictment" and "exposed to over 10 years." (*Id.*)

Meszaros decided to replace Brill and, in or around April 2007, he met with, and ultimately agreed to retain, Scaring. (Hr. Tr. 16:12-16; Movant's Ex. G.) Scaring's associate, Brissenden, was also to assist in the case. (Hr. Tr. 142:13-18.)

In May 2007, Brissenden and Meszaros attended the reverse proffer session with the government. (Hr. Tr. 173:20-174:1.) During this meeting, AUSA Bode outlined the government's evidence against Meszaros in connection with the Nexus/Livestreet fraud and reiterated its two-year plea offer. (*See* Hr. Tr. 177-79, 233.) The government also discussed its ongoing investigation into the Penta-Cycle fraud. (*See generally* Hr. Tr. 177-79.)

Both AUSA Bode and Brissenden prepared notes in connection with the reverse proffer. (*See* Resp't's Exs. 4, 6.) AUSA Bode's document was prepared in advance

---

[4] The government submitted a page of handwritten notes that AUSA Bode prepared to show Meszaros at the meeting. (Hr. Tr. 246:10-247:6; Resp't's Ex. 2.) The notes reflect the general terms of the agreement delineated above, including the calculation of a Guidelines range of 24 to 30 months for the Nexus/Livestreet fraud. (*Id.*)

[5] AUSA Bode also prepared a second page of notes, which he believes were created for his personal reference during this meeting. (*See* Hr. Tr. 253-54.) The notes state: "[i]f superseding . . . Guidelines <u>very high</u>." (Movant's Ex. J.)

of, and then presented during, the meeting. (*See* Hr. Tr. 248-49.) The document is titled "Guidelines" and is divided into two columns, one labeled "Trial" and one labeled "Plea." (*See* Hr. Tr. 248-50; Resp't's Ex. 6.) In the respective columns, AUSA Bode lists the various Guidelines elements (e.g. loss amount, use of sophisticated means, abuse of trust) and calculates the corresponding Guidelines range. (*See id.*) Under the "Trial" heading, he calculates a Guidelines range of 235 to 293 months. (*See id.*) In the plea column, his total is 51 to 63 months. (*See id.*)

After the meeting, Brissenden compiled his notes from the reverse proffer and his conversations with Meszaros into a memorandum for Scaring. (Resp't's Ex. 4; Hr. Tr. 174:20-24.) The memorandum reports that, at the meeting "[w]e discussed the current indictment and allegations relating to the potential superseding indictment." (Resp't's Ex. 4.) The document is broken into five sections: in the first section, Brissenden describes the evidence presented by the government during the reverse proffer concerning the Nexus/Livestreet fraud; in the second section, Brissenden provides Meszaros's "rebuttal" to the government's evidence. (*See* Hr. Tr. 177.) The third and fourth sections provide the same information, but as it relates to the Penta-Cycle fraud. (*Id.*) The final section of the memorandum is titled "Proposed Disposition." (Resp't's Ex. 4.) It states "[AUSA] Bode [c]laims that if he throws everything at [Meszaros], based on a loss amount of more than 2.5 million, [Meszaros] could end up with a Guideline calculation of 38 (253[6]-293 mos.)." (*Id.*) It notes, however, that "[i]f [Meszaros] were to plead guilty, [AUSA] Bode suggested it

could be done one of two ways. [Meszaros] could plead to both schemes, or just plead to the 1st scheme. . . . Assuming [he] pled guilty to both schemes . . . the recommended sentence would be 51-63 months. In the alternative, if [he] were to plead guilty to just the first scheme, . . . [it would] result[] in . . . 24-30[] months." (*Id.*) Brissenden adds that, if Meszaros were to plead only to the first scheme, AUSA Bode indicated that he would be willing to let the Penta-Cycle fraud "play out for a time," but AUSA Bode also "admit[ed] he may eventually be required to charge [Meszaros] with something, even if there is full restitution." (*Id.*)

On May 31, 2007, the Grand Jury returned a Superseding Indictment charging Meszaros in seven counts. *See United States v. Meszaros*, No. 06-CR-0290 JFB/ARL, 2008 WL 5113425, at *1 (E.D.N.Y. Nov. 25, 2008). Counts One and Two pertained to his involvement with the Nexus/Livestreet fraud; Counts Three through Six related to the Penta-Cycle fraud, and Count Seven alleged that Meszaros committed the conduct in Counts Three through Six while on bail. *Meszaros*, 2008 WL 5113425, at *1.

In June 2007, after the Superseding Indictment was returned, the government moved to revoke Meszaros's bail, arguing in a letter to this Court that Meszaros was a likely flight risk because his Guidelines range under the Superseding Indictment was 235 to 293 months. (*See* Movant's Ex. B.) Meszaros's attorneys submitted a reply letter, in which they characterized the government's assertion that Meszaros would be sentenced to 235 to 293 months as "absurd" given the circumstances and pointed out that the government had recently proposed to resolve

---

[6] Brissenden testified that his reference to 253 months was a typographical error and that he intended to write 235 months. (*See* Hr. Tr. 182.)

both frauds with a plea agreement whereby Meszaros would serve only 51 to 63 months. (*See* Movant's Ex. C.) The letter also noted that Meszaros had "declined the Government's plea offers and ha[d] strongly maintained his innocence." (*Id.*) Meszaros claims that he never saw either letter. (*See* Hr. Tr. 70.)

Meszaros was allowed to remain on bail, and he set about preparing his defense. He visited his attorneys' office regularly to review evidence and discuss his case. (Hr. Tr. 162:23-163:9.) Scaring and Brissenden also started to prepare for trial; however, as they reviewed the evidence, they began to have concerns about Meszaros's defense. (Hr. Tr. 186:2-14.) They testified that they endeavored to convey their misgivings to Meszaros, but he appeared unaffected. (Hr. Tr. 186:9-14.) Accordingly, they testified, they therefore convened a meeting with Meszaros and his wife, who was paying for his defense, for the purpose of presenting the weaknesses in the case to both of them, with the hope that Ms. Meszaros might be able to reason with her husband. (Hr. Tr. 186:11-187:7.) Meszaros denies that such a meeting with his wife transpired. (Hr. Tr. 229:7-15.)

Meszaros did not accept a plea and proceeded to trial, where the jury found him guilty on Counts One through Six. After the verdict was announced, AUSA Bode moved in open court, in Meszaros's presence, that Meszaros be held in custody until sentencing, noting that "the defendant's Guidelines are quite high. . . . [M]y recollection . . . [is that they] are in the neighborhood of 15 years." (Resp't's Ex. 9.)

Shortly after the trial, in a letter dated July 10, 2008, Scaring wrote to Ms. Meszaros regarding her husband's sentencing. (Movant's Ex. A.) He stated "[a]s you know, the government is going to be arguing for a sentence in the fifteen (15) year range"; he added, however, "I do not believe that the sentence Steve will receive will be anywhere near that number and, more than likely, will be in the range of six (6) to eight (8) years." (*Id.*)

Several months later, Brissenden received a copy of Meszaros's pre-sentence report ("PSR"). The PSR recommended a sentence of 220 months. (Decl. of Steven Meszaros ("Decl.") ¶ 13, ECF No. 1-1 (14-cv-1076).) On April 22, 2009, this Court sentenced Meszaros to 151 months in prison. (Decl. ¶ 16.)

Meszaros appealed his conviction to the Second Circuit; he claimed certain errors regarding the Court's rulings during trial and its Sentencing Guidelines calculations, including denial of severance, failure to consider childhood history for downward departure, and that the sentence given on Count Two exceeded the statutory maximum. His appeal did not challenge the efficacy of his representation. The Second Circuit held that the sentence on Count Two exceeded the statutory maximum and remanded for resentencing on this Count, but affirmed the remainder of the judgment. Meszaros was resentenced in February 2011. (ECF Nos. 207, 208 (06-cr-503).) Although his sentence on Count Two was reduced, his total sentence remained 151 months, based on the sentences imposed for the other Counts.

II.        THE PENDING MOTION

On February 18, 2014, Meszaros, proceeding *pro se*, filed the current motion pursuant to 28 U.S.C. § 2255 to vacate his sentence based on ineffective assistance of counsel. Specifically, Meszaros alleged that, in the fall of 2006 and again at the reverse proffer in May 2007, the government made him an offer whereby he could plead guilty to

the Nexus/Livestreet fraud and serve a two-year sentence, and the government would allow the Penta-Cycle fraud to be resolved civilly.[7] (Decl. ¶ 3.) He contended that he sought Scaring's advice on whether to take the plea and that Scaring told him that it was not a good offer because his maximum exposure if convicted was only five years. (Decl. ¶ 5.) Meszaros further asserted that Scaring repeatedly assured him that his maximum exposure was five years, even after the Superseding Indictment was returned. (Decl. ¶ 8.) In fact, Meszaros maintained that it was not until he received the PSR, which recommended a sentence of 220 months, that he learned that his exposure might exceed five years. (Decl. ¶ 13.) Meszaros claimed that Scaring and Brissenden did not meet the minimum objective standards of performance for defense counsel because they failed to accurately advise him regarding his maximum sentencing exposure and that this failure prejudiced him because, if he had been "properly informed . . . that [his] maximum sentence exposure was 20 years and not 5 years[,] [he] would have accepted the government plea offer." (Decl. ¶ 15.) Meszaros requested an evidentiary hearing on his motion.

The government opposed Meszaros's motion on April 11, 2014 and argued that Meszaros was well-aware of his sentencing exposure and pointed to the parties' correspondence from June 2007 concerning the revocation of Meszaros's bail, which referenced Meszaros's maximum sentence under the Guidelines. (Resp't's Opp'n to Mot. to Vacate ("Opp'n") 31, ECF. No. 216 (06-cr-503).) Specifically, the government noted that its letter from June 1 specifically mentioned that Meszaros could face a sentence of 235 to 293 months, and that the response submitted on behalf of Meszaros, while characterizing such a sentence as "absurd" based on the circumstances of the case, recognized that this range was the government's calculation. (*Id.*) Additionally, the government disputed that it had ever offered a two-year plea agreement, contending that it had only offered the 51- to 63-month sentence. (*See* Opp'n 30.)

Meszaros submitted his reply on May 19, 2014. He contended that Scaring and Brissenden had never informed him about either the 51- to 63-month plea offer or his maximum sentence under the Guidelines of 235 to 293 months, and that the government's Opposition was the first time he had been made aware of this information. (Reply Mem. ("Reply") ¶¶ 26-27, ECF No. 7 (14-cv-1076).) He acknowledged that both Guidelines ranges were contained in the June 2007 correspondence concerning his bail revocation, but he alleged that he never saw either letter. (Reply ¶¶ 22-23.) Meszaros asserted that Scaring and Brissenden's failure to inform him about the 51- to 63-month plea offer, as well as his maximum sentencing exposure of 235 to 293 months, prevented him from making an informed decision about whether to proceed to trial and plainly qualified as ineffective assistance of counsel. Additionally, he refuted the government's position that a two-year plea had not been offered by providing a declaration from Brill, in which Brill attested that the government made such an offer. (Decl. of Steven Brill ¶ 3, ECF No. 7 (14-cv-1076).)

On April 21, 2015, this Court granted Meszaros's request for a hearing, concluding that "Meszaros has presented a plausible

---

[7] The alleged plea also required Meszaros to make restitution payments. However, these payments are not at issue in the instant petition.

Sixth Amendment claim, and there are disputed facts beyond the record that need to be resolved at an evidentiary hearing." (ECF No. 11 (14-cv-1076).) Specifically, this Court found that "an evidentiary hearing is warranted, both to determine whether counsel's performance was deficient and whether Meszaros actually would have consented to a plea agreement." (*Id.*) The Court's April 21 Order also directed that Meszaros be appointed counsel to represent him during the hearing. (*Id.*)

III.    HEARING TESTIMONY

The Court conducted the hearing over two days on February 22 and March 14, 2016 and heard testimony from Ms. Meszaros, Meszaros, Brill, Scaring, Brissenden, Investigator Cox, and AUSA Bode. Meszaros was represented at the hearing by Gary Schoer, Esq. The testimony is summarized in relevant part below.

A.    Ms. Meszaros

Ms. Meszaros testified that, in the fall of 2006, Brill informed her and her husband that the government had made a plea offer with a two-year sentence. (*See* Hr. Tr. 8.) Although they discussed the offer with Brill at the time, they had been advised to seek a second opinion on the plea from another attorney, so they reached out to Scaring. (*See* Hr. Tr. 10.) They retained Scaring in April 2007. (Movant's Ex. G.)

She stated that she was invited to attend a meeting with her husband, Scaring, and Brissenden on April 27, 2007. (*See* Hr. Tr. 12.) She testified that Scaring started the meeting by informing her that her husband was "facing significant accusations" and "a significant amount of time." (Hr. Tr. 12:16-19.) The group then proceeded to review some of the "difficult" evidence against her

husband. (*See* Hr. Tr. 12-13.) After this exercise, Ms. Meszaros testified that she asked Scaring, "You think we can win this?", to which he allegedly replied, "Yes." (Hr. Tr. 13:12-13.) She then supposedly asked Scaring, "What's the worst case scenario?", to which he allegedly replied, "Five years." (Hr. Tr. 13:19-22.) She testified that this advice "had all the impact in the world" on the couple's decision to try the case rather than take the plea. (*See* Hr. Tr. 15:22-16:19.)

It was her understanding that the same two-year plea was offered again during the reverse proffer in May 2007, but she testified that her husband told her "[Scaring] still is advising the worst case scenario is five years. So we're you know, standing the course, continuing on." (*See* Hr. Tr. 16:22-17:10.) Similarly, she testified that, after the Superseding Indictment was issued, Scaring did not revise Meszaros's estimated sentencing exposure. (Hr. Tr. 18:3-12.) Even on the day of the jury deliberations, she contends that Scaring reiterated that her husband's maximum sentencing exposure was five years. (Hr. Tr. 30:4-14.)

She testified that she did receive Scaring's July 10, 2008 letter in which he advised that the government would likely seek a sentence of fifteen years. (*See* Hr. Tr. 28.) The Court asked Ms. Meszaros why, if she had been repeatedly assured that her husband's maximum exposure was five years, she did not come to the Court and complain that she had been misled about her husband's potential sentence after Scaring's letter informed her that he might face as many as fifteen years. (*See* Hr. Tr. 48.) She replied that "at the end of the day, your Honor, when you're up against this, you don't think anybody is going to believe anything that you are saying. At the end of the day, I was in a contentious relationship with my own attorney." (Hr. Tr. 48:20-49:4.)

She conceded that her husband had continued to assert his innocence. (*See* Hr. Tr. 35:17-20 ("Q: In all your conversations, up to and including today, [your husband] asserted his innocence? A: He asserted his innocence, and we paid an attorney to guide us accordingly.").)

## B. Meszaros

Meszaros took the stand after his wife. He testified that in the fall of 2006, Brill relayed to him a two-year plea offer from the government in exchange for pleading guilty to the Nexus/Livestreet fraud. (Hr. Tr. 55:23-56:4.) In his moving papers, he also takes the position that, in conjunction with this offer, the government agreed to permit the Penta-Cycle fraud to be resolved civilly. (Decl. ¶ 3.) He further stated that, after his conversation with Brill, it was his understanding that his maximum exposure in connection with the Nexus/Livestreet charges was five years. (Hr. Tr. 56:8-11.) However, he also admitted that as revelations about the Penta-Cycle fraud crystalized, "the conversation veered from five years to potentially more," though he did not recall any specifics. (Hr. Tr. 56:15-23.)

Meszaros testified that he was advised to seek a second opinion on the merits of the plea offer and so he went to Scaring. (*See* Hr. Tr. 57.) During their initial meeting, Scaring purportedly stated that the two-year offer was "not a good offer" because, if convicted, Meszaros would likely only be subject to a sentence of three to five years. (*See* Hr. Tr. 58.)

Meszaros also testified regarding the reverse proffer conducted on May 2, 2007. In particular, he stated that, at the end of the meeting, AUSA Bode "repeated his offer of the two-year offer . . . [a]nd added that he would allow . . . the [Penta-Cycle] situation to play out in civil court." (*See* Hr. Tr. 64.)

Meszaros stated that immediately following the meeting, he and Brissenden walked to the parking lot to discuss what had transpired. (*See* Hr. Tr. 65.) Brissenden purportedly told him not to worry and that the government was just trying to scare him into taking a plea, an assessment which Scaring allegedly confirmed when the pair called him. (*Id.*) Meszaros reiterated that neither the government's proposed Guidelines range of 235 to 293 months, nor the 51- to 63-month plea offer, were discussed at the meeting. (Hr. Tr. 234:18-25.)

When the Superseding Indictment was returned, charging Meszaros for his involvement with both frauds, he stated that there was no discussion about how his exposure might have changed, rather the focus was on severing the new counts from the original ones. (*See* Hr. Tr. 66.)

Meszaros denied seeing either the government's June 1, 2007 letter that referenced the maximum Guidelines sentence of 235 to 293 months or the June 4 letter, submitted on his behalf, which referenced the 51- to 63-month offer and acknowledged the government's calculation of the Guidelines range. (*See* Hr. Tr. 225-26.)

Meszaros asserted that Scaring repeatedly assured him that his maximum sentencing exposure was five years. (*See* Hr. Tr. 79.) In fact, Meszaros maintains that he did not become aware that his exposure significantly exceeded five years until Brissenden advised him that the PSR recommended a sentence of 220 months. (*See* Hr. Tr. 83; Decl. ¶ 13.)

Finally, Meszaros again asserted that, if he had known that he faced a potential

sentence of 235 to 293 months, or even his sentence of 151 months, he would have accepted the government's plea offer. (Hr. Tr. 79:25-80:15.)

### C. Brill

Brill testified that he attended a reverse proffer session with the government in January 2007, at which time Meszaros had only been charged in connection with the Nexus/Livestreet fraud and, therefore, faced a maximum exposure of ten years. (Hr. Tr. 101:23-102:8.)

Brill also discussed the notes he prepared after this meeting, titled "Meszaros Plea Offer (as of March 29)." (Resp't's Ex. 3.) He acknowledged that in the section of the notes under the heading "explained to client," he had written that if a Superseding Indictment were returned, Meszaros would be subject to a sentence of more than ten years (*see* Hr. Tr. 109), and testified that he would not have placed this note in that section if he had not discussed it with Meszaros (*see* Hr. Tr. 109-110).

### D. Scaring

According to Scaring, Meszaros came to him, not for a second opinion on the plea offer, but because "he wanted to go to trial because he said that he didn't do anything wrong. . . . He came to us because he did not want to take a plea and wanted to go to trial. . . . He never, ever said to us that he had committed any crime." (Hr. Tr. 143:19-144:4; *see also* Hr. Tr. 146:23-24 ("[H]e was coming to us to try the case, not to negotiate a plea. . . .").)

Scaring recalled discussing the two-year plea deal after the reverse proffer.[8] (*See* Hr. Tr. 127.) Scaring explained that he had concerns about the two-year agreement because it would only resolve the Nexus/Livestreet fraud and would therefore leave Meszaros exposed on the Penta-Cycle fraud. (*Id.*) Scaring stated that he explained this reservation to Meszaros. (*See* Hr. Tr. 127-28.) He recalled that the government had also proposed resolving both frauds with the 51- to 63-month deal. (*See* Hr. Tr. 127:20-23.) He explained, however, that, "in any event, Mr. Meszaros emphatically claimed he was innocent of both [frauds], so it never went anywhere." (Hr. Tr. 128:13-14.)

Scaring testified that he did not have a specific recollection of discussing the June 2007 bail letters with Meszaros, but said that he and Brissenden typically would not submit a bail letter without first discussing it with the client. (*See* Hr. Tr. 138-39.)

Scaring testified that, as they prepared for trial, he and Brissenden became increasingly concerned that there were "serious problems" with the case and that Meszaros did not have a realistic view of the evidence. (*See* Hr. Tr. 133, 160:4-6 ("[W]e believed at that time we had a very bad case and the chances of losing were pretty high.").) They attempted to convey their concerns to Meszaros, but said that it was difficult to do so because "[Meszaros] was not buying anything. He would spin the evidence. He had a view of what his defense was. He believed it." (Hr. Tr. 129:7-12, 162:15-16 ("[W]e had some serious problems and . . . Mr. Meszaros wasn't listening to us.").) They were also concerned that Meszaros was not sharing the weaknesses in his defense with his wife, even

---

[8] Scaring denied opining on whether Meszaros should take the two-year plea during their initial meeting, explaining that, at that time, he "didn't have sufficient

evidence to make such a representation." (Hr. Tr. 155:8-15.)

though she was financing his defense. (*See* Hr. Tr. 154:10-13 ("[I]t was becoming clearer to us that we had issues going forward and we were not satisfied that Mr. Meszaros was being honest with himself, or with his family, regarding his exposure.").) Accordingly, Scaring testified that he and Brissenden met with Meszaros and Ms. Meszaros together, in order to "la[y] out . . . all the problems with the case." (*See* Hr. Tr. 129.) He also testified that they discussed the plea options during this meeting and the fact that Meszaros would face "significant" jail time if he lost at trial. (*See* Hr. Tr. 132, 160.)

Scaring also testified that he never told Meszaros that it was not possible for him to receive a sentence of greater than five years. (Hr. Tr. 132:11-14.) Likewise, he denied ever telling Ms. Meszaros that the "worst case scenario is five years." (Hr. Tr. 149:6-9.) He explained "[i]t was never an issue as to whether or not [Meszaros] faced less than five years." (Hr. Tr. 165:16-17.)

### E. Brissenden

Brissenden testified that he attended the May 2007 reverse proffer along with Meszaros and that he had "no doubt" that the government's calculated Guidelines range of 235 to 293 months was discussed (Hr. Tr. 188:18-25), as well as both the 24- to 30-month and the 51- to 63-month plea offers (Hr. Tr. 179, 180:19-22).

Brissenden also testified that Meszaros continued to profess his innocence and never gave any indication that he wanted to plea. (*See, e.g.*, Hr. Tr. 181:22-182:2, 187:9-10, 197:5-9, 205:11-14 ("Q: Did you have any negotiations with the government at that point with respect to a plea? A. No, because there was never the slightest inclination in the part of our client to go down that road.").) He described Meszaros as adamant that he wanted to go to trial, even in the face of damaging evidence. (*See, e.g.*, Hr. Tr. 186:5-11 ("[I was] assessing th[e] discovery . . . [and] grew more concerned about our prospects for trial. And then there were conversations with Mr. Meszaros. He was adamant that he still wanted to go to trial."), 187.) Brissenden did not believe that Meszaros was grasping the strength of the case against him, despite "multiple conversations" about weaknesses in his defense. (*See* Hr. Tr. 186-87.) Brissenden testified that he and Scaring therefore invited Ms. Meszaros to attend one of their meetings with Meszaros, hoping that, if they presented the problematic evidence to her, she could help "drive home the idea that [it] was going to be a difficult trial to win at" (Hr. Tr. 186:15-18), and help him see that "there was a very serious risk that he was going to be convicted if he insisted on taking this case to trial" (Hr. Tr. 201:5-7).

However, Brissenden testified that the meeting did not have the "desired effect"; he explained: "Mr. Meszaros was adamant in maintaining his innocence all along. I don't think that meeting changed anything in that regard. He was always a strong proponent of taking the case to trial." (*See* Hr. Tr. 186-87.)

Brissenden was asked whether he ever advised Meszaros that it would be in his best interest to take a plea, and Brissenden responded, "Yes. I think that's fair to say. I don't know that we used that phrase, but I – certainly that was what we were trying to convey to Mr. Meszaros." (Hr. Tr. 205:2-7.) He added, "We were trying to sort of pressure him all along to consider taking a plea. But those conversations didn't really go anywhere." (Hr. Tr. 206:3-6.)

Brissenden testified that he was sure that he had discussions with Meszaros about the government's Guidelines calculation,

including in the context of explaining how the Guidelines operated, though he could not recall "word-for-word" any of the discussions. (Hr. Tr. 194:21-195:10.) He also testified that "we had the backdrop of the government's Guideline calculation in forming the discussion that we were having. So we were aware of what the government was advocating for a Guideline sentence if he should be convicted at trial." (Hr. Tr. 201:12-16.)

Finally, the Court asked Brissenden whether, when he spoke with Meszaros after the release of the PSR, which recommended a sentence of 220 months, Meszaros expressed shock or disbelief about this figure, in light of the fact that Meszaros contends that prior to that point he believed that his exposure was no more than five years. (*See* Hr. Tr. 211-12.) Brissenden responded that Meszaros was upset, but did not seem shocked. (Hr. Tr. 211:23-212:12.)

### F. Investigator Cox

Investigator Cox testified that he attended the January 18, 2007 reverse proffer and that Meszaros was present as well. (Hr. Tr. 236:10-13.) He recalled discussing the Guidelines calculations for both the Nexus/Livestreet fraud by itself, and what the Guidelines range would look like in the event that charges were added for the Penta-Cycle fraud. (Hr. Tr. 237:20-23.) In fact, he testified that he specifically recalled looking *at Meszaros* and telling him that his exposure if sentenced for both frauds could exceed seventeen years. (Hr. Tr. 238:10-13, 243:5-8.) He attributed the specificity of this

recollection to the fact that seventeen years was a long sentence in a white-collar case. (Hr. Tr. 238:14-16.)

### G. AUSA Bode

Finally, AUSA Bode took the stand. He likewise testified that Meszaros attended the January 18, 2007 proffer and that Meszaros was informed that the government was investigating the Penta-Cycle fraud and that a Superseding Indictment would result in a Guidelines range in excess of ten years. (*See* Hr. Tr. 245, 246:23-24.) He testified that he prepared notes for his personal use during the proffer that stated that the Guidelines range accompanying a Superseding Indictment would be "very high."[9] (*See* Hr. Tr. 255; Resp't's Ex. J.)

AUSA Bode also provided testimony regarding the May 2, 2007 reverse proffer. He stated that both the 51- to 63-month plea agreement and the 235- to 293-month maximum Guidelines range were discussed. (*See* Hr. Tr. 250.) He testified that both ranges were explicitly calculated in the notes he presented during the meeting and that he went through these calculations with Meszaros "step-by-step."[10] (*Id.*) He stated: "I walked through [my notes] with Mr. Meszaros and discussed how if he was interested, I would go to my supervisors and seek a plea agreement for . . . 51 to 63 months. And in essence I was leaning on the guidelines, giving him the benefit of every doubt for those guidelines, but that after trial, the way I saw the guidelines it was 235 to 293 months." (Hr. Tr. 250:13-19.)

---

[9] Although these notes were not presented during the meeting, their reference to a "very high" sentence corroborates AUSA Bode's testimony that he conveyed this information to Meszaros.

[10] AUSA Bode testified that it is his practice during

reverse proffer discussions to walk through Guidelines calculations and inform the defendant that, "[i]f you are interested, let me know and I'll take it to the supervisors to see if a plea agreement, a plea offer can be made." (Hr. Tr. 245.)

## IV. FINDINGS OF FACT

Based on the evidence in the record, the parties' written submissions, and the testimony elicited during the evidentiary hearing, including an assessment of the credibility of the witnesses, the Court makes the following findings of fact:

### A. Meszaros Was Informed About the 51- to 63-Month Plea Offer[11]

Although Meszaros asserts in his reply submission that he did not become aware of the government's 51- to 63- month plea offer until the government submitted its opposition to the instant petition in April 2014, the Court concludes that Meszaros was informed about the offer during the May 2, 2007 reverse proffer. AUSA Bode and Brissenden both credibly testified that this offer was explicitly discussed during this meeting. Their testimony is corroborated by their contemporaneous notes. (*See* Resp't's Exs. 4, 6); *see also United States v. Nunez-Polanco*, 20 F. Supp. 3d 473, 480 (S.D.N.Y. 2014) (relying on circumstantial evidence, including attorney's notes, to conclude that a plea offer had been communicated to the defendant). Brissenden's memorandum states that the government offered Meszaros a plea deal that would allow him to plead to both frauds with a recommended sentence of 51 to 63 months (Resp't's Ex. 4); his statement is consistent with AUSA Bode's notes, which include a calculation of a 51- to 63-month Guidelines range in the section of the document regarding pleas (Resp't's Ex. 6). Further, this plea offer was mentioned in Scaring's June 2007 letter to the Court on the issue of Meszaros's bail. (Movant's Ex. C ("[T]he Government ha[s] recently proposed a disposition whereby the Defendant would plead to (sic) guilty to both the Nexus/Livestreet and Penta-Cycle allegations in return for a sentence in the range of 51 to 63 months.").) Though Meszaros maintains that he did not see this letter, its reference to the plea agreement is consistent with the position that the agreement was discussed during the May 2007 meeting, at which Meszaros was unquestionably present.

### B. Meszaros Was Aware His Maximum Sentencing Exposure Exceeded Five Years

Second, the Court rejects Meszaros's contention that Scaring repeatedly assured him that his maximum exposure would not exceed five years.[12] Instead, the Court

---

[11] Meszaros admits that he received the initial two-year plea offer for the Nexus/Livestreet fraud, and the Court independently finds that such an offer was made and communicated to Meszaros. However, the Court does not find (as Meszaros has suggested) that this offer included any representation that the Penta-Cycle fraud would be handled civilly and no further criminal charges would be brought. Instead, the credible evidence demonstrates that, as part of the initial plea offer, the potential for additional charges based on the Penta-Cycle fraud was left unresolved (although a potential civil resolution was possible).

[12] In support of this argument, Meszaros submits declarations from his sister and brother-in-law. His sister avers that during the trial, she heard Scaring state that the worst sentence Meszaros would receive if he lost would be two to three years. (*See* Decl. of Jacqueline Gould, ECF No. 4 (14-cv-1076).) Her husband's declaration states that his wife related this information to him. (*See* Decl. of Charles A. Gould IV, ECF No. 4 (14-cv-1076).) This testimony is hearsay (and double hearsay), and does not alter the Court's analysis. First, Ms. Gould does not state that Scaring made this statement in Meszaros's presence, so it is of little probative value in assessing the advice rendered *to Meszaros*. *See Munoz v. United States*, No. 07 CIV. 2080, 2012 WL 666783, at *5 (E.D.N.Y. Feb. 29, 2012) (discounting the defendant's relative's testimony that counsel said he could win the case and that the defendant would not face a sentence of more than three years because testimony had minimal corroborative value given that relatives were not present for any conversations between counsel and the

concludes that Meszaros was aware that his maximum exposure exceeded five years and, more specifically, that the government estimated his sentencing Guidelines range for both frauds to be between 235 and 293 months.

Scaring credibly denies representing that Meszaros's maximum exposure would not exceed five years. (Hr. Tr. 132:11-14 ("Q: Did you ever tell Steven Meszaros that it was not possible for him to receive a sentence of greater than five years? A: No.").) Scaring testified that he knew that the two counts related to the Nexus/Livestreet fraud each carried a five-year sentence (Hr. Tr. 142:24-143:1); thus, it is implausible that he would have represented that Meszaros's maximum exposure was only five years after the Superseding Indictment was returned incorporating the Penta-Cycle fraud, which involved more victims and a greater loss amount.[13] In like manner, it is implausible that Brissenden or Scaring would have informed Meszaros that his maximum exposure was five years after being informed during the reverse proffer in May 2007 that it could exceed twenty-four years.[14] *See also Colotti v. United States*, No. 04 CR 1110-02, 2012 WL 1122972, at *15 (S.D.N.Y. Apr. 4, 2012) (rejecting the contention that counsel would advise defendant that his maximum sentence could not exceed thirteen years when both the attorney and the client had been made well-aware during the pretrial process that the offenses charged in the indictment carried a potential term of imprisonment of twenty years).

Separately, the record does not support the conclusion that Meszaros actually believed that his maximum exposure was five years. Meszaros testified that he knew that he faced a five-year sentence solely for the counts related to the Nexus/Livestreet fraud (Hr. Tr. 56:8-11), and (as with Scaring) it is not credible that he did not believe that his sentence exposure would not increase if he were convicted of the Penta-Cycle fraud as well. In fact, Meszaros admitted as much, acknowledging that as his responsibility for the Penta-Cycle fraud came into focus, "the conversation veered from five years to potentially more." (Hr. Tr. 56:15-23.) Furthermore, Brill's notes indicate that he informed Meszaros that, if a Superseding Indictment were issued, Meszaros would be "exposed to over 10 years." (Resp't's Ex. 3.) Investigator Cox even testified that he had a specific recollection of looking *at Meszaros* and informing him that his exposure could exceed seventeen years. (Hr. Tr. 238:12-13.)

Finally, Meszaros's contention that it was not until he received the PSR that he knew that his sentencing exposure exceeded five years, is incredible in light of his apparent failure to react to what should have been shocking news. Brissenden testified that when Meszaros received the PSR recommending a sentence of 220 months, Meszaros appeared concerned, but not

---

defendant). Additionally, it occurred after Meszaros had already proceeded to trial, and therefore has limited bearing on his decision to forgo the plea offers.

[13] As reflected in Brissenden and AUSA Bode's respective notes from the May 2007 reverse proffer, the Nexus/Livestreet fraud involved only one investor and a loss amount of $1.9 million, whereas the Penta-Cycle fraud involved at least two other investors and a minimum loss amount of $2.5 million. (*See* Resp't's Exs. 4, 6.)

[14] Of course, Scaring was not present during the reverse proffer when the government shared this information. However, he was advised about the government's Guidelines range in the memorandum that Brissenden prepared for him. (*See* Resp't's Ex. 4.)

surprised, and never questioned Brissenden about why this number was so much greater than what he had been allegedly assured was his maximum exposure. (Hr. Tr. 211:23-212:12.) Presumably, if Meszaros believed to that point that his maximum exposure was five years, he would have made some protest, or at least some inquiry, when he learned that the government had recommended a sentence nearly four times greater.[15] Additionally, when Meszaros appeared before this Court and was sentenced to 151 months, he never stated that his attorneys had failed to inform him that he could be sentenced to more than five years. Ms. Meszaros testified that they did not raise this issue with the Court because they feared that they would not be believed (Hr. Tr. 48:19-49:4), but the Court does not find this explanation persuasive in light of all the evidence presented at the hearing.

The record further evidences that Meszaros was made aware of his actual maximum sentencing exposure. Both AUSA Bode and Brissenden credibly testified that, during the reverse proffer on May 2, 2007, Meszaros was advised that he would face a Guidelines sentence of 235 to 293 months under the anticipated Superseding Indictment. (Hr. Tr. 182 (Brissenden), 248-50 (AUSA Bode).) Their testimony is also substantiated by their respective, contemporaneously-prepared notes regarding the proffer, which both make reference to the 235- to 293-month Guidelines range. (*See* Resp't's Exs. 4 (Brissenden writes: "[AUSA] Bode [c]laims that if he throws everything at [Meszaros], . . . [Meszaros] could end up with a Guideline calculation of 38 (2[35]-293 mos.)."), 6.) In addition, the government's June 2007 bail letter and Scaring's response

both make reference to the 235- to 293-month range. Again, while Meszaros claims he did not see this correspondence at the time it was filed, the reference to the Guidelines range supports the conclusion that it was discussed during the reverse proffer, in Meszaros's presence.

## V.   LEGAL STANDARD

### A.   Section 2255

Pursuant to 28 U.S.C. § 2255, a prisoner sentenced in federal court may "move the court which imposed the sentence to vacate, set aside or correct the sentence" when the petitioner claims "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). With respect to ineffective assistance of counsel claims under Section 2255, the Supreme Court has stated that "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance." *Massaro v. United States*, 538 U.S. 500, 504 (2003).

### B.   Ineffective Assistance of Counsel

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and (2) "there is

---

[15] An e-mail exchange around this time is especially telling on this point. In preparation for Meszaros's sentencing, Brissenden e-mailed him a draft of (presumably) the sentencing memorandum Brissenden had prepared, to which Meszaros replied, "[f]antastic work, hard to believe we lost the case!! Thank you so much." (Movant's Ex. C at 158.) It is hard to imagine such an upbeat exchange if Meszaros truly believed that he had been misled by his attorneys for months.

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

### 1. Performance Prong

With respect to *Strickland*'s performance prong, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.'" *Id.* (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). In assessing performance, a court "must apply a 'heavy measure of deference to counsel's judgments.'" *Id.* (quoting *Strickland*, 466 U.S. at 691).

In the context of plea negotiations, "counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012). Additionally, "defense counsel 'must give the client the benefit of counsel's professional advice on this crucial decision' of whether to plead guilty." *Purdy v. United States*, 208 F.3d 41, 44 (2d Cir. 2000) (quoting *Boria v. Keane*, 99 F.3d 492, 497 (2d Cir. 1996)). As part of this advice, an attorney "should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." *Purdy*, 208 F.3d at

45. There is no *per se* rule that defense counsel must always expressly advise the defendant whether to take a plea offer. *Id.* at 48. "[T]he ultimate decision whether to plead guilty must be made by the defendant," and a "lawyer must take care not to coerce a client into either accepting or rejecting a plea offer." *Id.* at 45

In recognition of the challenge of "steer[ing] a course between the Scylla of inadequate advice and the Charybdis of coercing a plea," there is a "wide range" of what qualifies as reasonable advice pertaining to the acceptance or rejection of a plea offer. *See id.* The Second Circuit has advised that:

> [c]ounsel rendering advice in this critical area may take into account, among other factors, the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea (whether or not accompanied by an agreement with the government), whether the defendant has maintained his innocence, and the defendant's comprehension of the various factors that will inform his plea decision.

*Id.*

### 2. Prejudice Prong

The second prong of the *Strickland* standard focuses on prejudice to the petitioner. *Strickland*, 466 U.S. at 694. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

"Reasonable probability" means that the errors were of a magnitude such that they "'undermine[] confidence in the outcome.'" *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland*, the determination of prejudice may be made with the benefit of hindsight." *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007) (internal citation and quotation marks omitted).

"To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Frye*, 132 S. Ct. at 1409. Although, the Court "need not accept petitioners' self-serving, post-conviction statements that [they] would have pleaded guilty if properly advised," *Dodakian v. United States*, No. 14-CV-01188(AJN)(SN), 2015 WL 11144511, at *14 (S.D.N.Y. Aug. 14, 2015), *report and recommendation adopted*, No. 14-CV-1188 (AJN), 2016 WL 3866581 (S.D.N.Y. July 12, 2016); *Shi Yong Wei v. United States*, No. 11 CIV. 6961 RMB, 2013 WL 980151, at *5 (S.D.N.Y. Mar. 12, 2013) (citing *U.S. v. Gordon*, 156 F.3d 376, 378, 380-81 (2d Cir. 1998)),

petitioners may establish that they would have accepted a plea by providing a credible sworn statement to that effect that is supported by objective evidence. *Vargas v. United States*, 951 F. Supp. 2d 531, 550 (S.D.N.Y. 2013). Objective evidence may come in the form of a "significant disparity" between the sentence recommended in the plea offer and the sentence imposed after a conviction at trial.[16] *See Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003). However, such a disparity in outcomes does not *mandate* a finding of prejudice. *See Page v. Martuscello*, No. 10 CIV. 9699 JSR AJP, 2011 WL 3678820, at *27 (S.D.N.Y. Aug. 23, 2011) ("The Second Circuit, however, did not create a *per se* rule that a petitioner is always prejudiced when there is a significant sentencing disparity; rather, such disparity is simply a factor for a court to consider in addressing prejudice."), *report and recommendation adopted*, No. 10 CIV. 9699 JSR, 2013 WL 1092825 (S.D.N.Y. Mar. 15, 2013), *aff'd*, 561 F. App'x 118 (2d Cir. 2014); *Muyet v. United States*, No. 03 CIV. 4247 (PKL), 2009 WL 2568430, at *5 (S.D.N.Y. Aug. 19, 2009) ("While a significant sentence disparity between the plea offer and the actual sentence imposed can be indicative of prejudice, such a disparity does not mandate a finding of prejudice in all cases." (internal citations omitted)). Rather, "[e]ven with such a disparity . . . the district court must still find the defendant's evidence to the effect that he would have made a different decision but for his counsel's deficient advice to be credible." *United States v. Frederick*, 526 F. App'x 91, 93 (2d Cir. 2013).

---

[16] "There is no magic formula to use in determining whether a disparity between sentences is 'significant.'" *Mickens v. United States*, No. 97-CV-2122 JS, 2005 WL 2038589, at *8 (E.D.N.Y. Aug. 17, 2005). In *Pham*, the Second Circuit found a significant disparity where the sentence imposed was "more than double" the plea offer (210 months compared to 78-97 months). A difference of more than double, however, is not required. *See id.* (citing *U.S. v. Gordon*, 156 F.3d 376, 378, 381 (2d Cir. 1998) (finding significant disparity between 120-month sentence and a 210-month sentence)).

## VI.     Application

### A.     Performance Prong

As described above, the *Strickland* standard requires a defendant to demonstrate that his counsel's performance was deficient. In this regard, Meszaros argues that his attorneys (a) failed to communicate the 51- to 63-month plea offer; (b) failed to advise him of his maximum sentencing exposure under the Superseding Indictment; and (c) failed to advise him on the issue of whether to proceed to trial or to enter a guilty plea.[17]

### 1.     Failure to Communicate 51- to 63-Month Plea Offer and Failure to Advise Regarding Maximum Sentencing Exposure

As explained above, a defendant must be advised of plea offers made by the government and of his maximum sentencing exposure. *See Frye*, 132 S. Ct. at 1408 (holding that "counsel has the duty to communicate formal offers from the prosecution"); *Gordon*, 156 F.3d at 380 (finding representation deficient where defense counsel grossly underestimated defendant's maximum sentencing exposure). The Court concluded above that Meszaros was made aware of the government's two plea offers and of his maximum sentencing exposure.[18] *See supra* at IV. Accordingly,

---

[17] In Meszaros's petition, filed prior to his alleged "discovery" of the 51- to 63-month plea offer, he argued that, had he been properly advised that he faced a maximum sentencing exposure of twenty years, he would have accepted the government's initial two-year plea offer. This contention fails. Underlying, and essential to, this argument is Meszaros's position that this offer included an agreement by the government to allow the Penta-Cycle fraud to be handled civilly (thereby effectively resolving the question of incarceration for both frauds). However, Brissenden's notes plainly reflect that the government made no such concession. (*See* Resp't's Ex. 4 ("[AUSA] Bode said he would wait to see what happens with civil litigation with [the Penta-Cycle plaintiffs] before deciding how to proceed with the second indictment, although he made no real promises." Additionally, "[AUSA Bode] admits that he may eventually be required to charge Steve with something [on the Penta-Cycle fraud], even if there is full restitution.").) Although AUSA Bode apparently agreed to allow the Penta-Cycle fraud to "play out" before seeking a second indictment, it is clear that the two-year plea agreement would have resolved *only* the Nexus/Livestreet fraud. Therefore, Meszaros's contention that he would have accepted the two-year plea had he known he was facing a twenty-year sentence is meaningless. He was not facing a twenty-year sentence in connection with the Nexus/Livestreet fraud, and his acceptance of the two-year plea could not have resolved his potential sentencing exposure in connection with the Penta-Cycle fraud.

[18] To the extent that it was the government, not Meszaros's counsel, that conveyed this information to him, the outcome of his ineffective assistance claim would be no different. Because Meszaros was advised of this critical information, he cannot show that he was prejudiced by the fact that it was allegedly not his attorneys who communicated it to him. *See, e.g., Mavashev v. United States*, No. 11-CV-3724 DLI, 2015 WL 1508313, at *8 (E.D.N.Y. Mar. 31, 2015) (holding that defendant could not show that he was prejudiced by counsel's alleged failure to provide details about the plea agreement where defendant and attorney attended reverse proffer session at which the government reviewed the plea offer); *Vargas*, 951 F. Supp. 2d at 555 (defendant could not show that he was prejudiced by attorney's alleged failure to inform him regarding his sentencing exposure because defendant knew about "high" potential sentence from bail hearing and "other sources"); *see also Ventura v. Meachum*, 957 F.2d 1048, 1058 (2d Cir. 1992) (court's conveyance at plea allocution of the actual sentencing possibilities that result from a defendant's guilty plea may correct any misrepresentation by counsel as to defendant's probable sentence); *Munoz*, 2012 WL 666783, at *5 (rejecting defendant's asserted ignorance regarding his maximum sentencing exposure where he was present at a bail hearing where the Court advised him regarding his exposure).

Meszaros cannot maintain his ineffective assistance claim on the grounds that he was not advised of the government's plea offer or his maximum sentencing exposure.

### 2. Failure to Advise Regarding Guilty Plea

As noted above, defense counsel must provide his client with professional advice on the crucial decision of whether to plead guilty and can "generally discharge [this] obligation by informing the defendant of (1) the strength of the case against him or her and (2) the possible sentence of incarceration that may be imposed after a guilty plea as compared to a guilty verdict." *Daley v. Lee*, No. 10-CV-6065 NGG, 2012 WL 2577472, at *11 (E.D.N.Y. July 3, 2012) (citing *Purdy*, 208 F.3d at 45).

The record reflects that Scaring and Brissenden advised Meszaros about the weaknesses in his case and the strength of the government's evidence. Brissenden credibly testified that "it was certainly conveyed to Mr. Meszaros that it was going to be problematic taking this case to trial." (Hr. Tr. 205:20-23.) Even Meszaros admits that he and Scaring "would sit an hour, two hours sometimes, and basically go over positives in our trial strategy, or what we're going to present, potential pitfalls, so on and so forth." (Hr. Tr. 76:6-9.) In fact, both attorneys credibly testified regarding the meeting that they convened with Meszaros and his wife expressly for the purpose of "la[ying] out the case . . . and all the problems with the case."[19] (Hr. Tr. 139:15-19.) As Brissenden explained, "the entire purpose of the meeting – and there were multiple conversations leading up to that point – was to advise Mr. Meszaros that it was going to be difficult to prevail at trial, and there was a very serious risk that he was going to be convicted if he insisted on taking this case to trial."[20] (Hr. Tr. 201:2-7.) Thus, it is clear that his attorneys informed him about the strength of the case against him. *See, e.g.*, *Purdy*, 208 F.3d at 46 (counsel satisfied obligation to convey strength of government's case by "repeatedly advising [the defendant] of the strengths of the government's case against him" and even performed a mock cross-examination of the defendant).

Furthermore, Meszaros admits that he sat through the reverse proffer in May 2007, at which the government provided a detailed and extensive outline of the case against him. (*See, e.g.*, Resp't's Ex. 4); *see Ortiz v. United States*, 2015 WL 5613182, at *3 (S.D.N.Y. Sept. 24, 2015) (defendant could not show that attorney failed to provide effective assistance of counsel where defendant was advised of nature and strength of government's evidence against him during reverse proffer session).

Finally, Meszaros is a sophisticated defendant, and the record reflects that he actively participated in his defense and strategized frequently with his attorneys. (*See, e.g.*, Hr. Tr. 162-163.) Scaring credibly testified that Meszaros came to the office "a lot," because he "was reviewing all of the evidence," and that they discussed the case during each visit. (*Id.*) Between his frequent

---

[19] Although there is a factual discrepancy over whether Ms. Meszaros attended a meeting where the evidence was discussed, the Court finds that the meeting took place with Meszaros, regardless of whether his wife was or was not present.

[20] In fact, Scaring and Brissenden were so aggressive in presenting the case against Meszaros that it allegedly upset Ms. Meszaros. Brissenden recalled that after the meeting, Meszaros told him that "his wife was disturbed by the meeting, [and] thought that, A, we didn't believe in him, and, B, that maybe we didn't even like him." (Hr. Tr. 188:2-4.)

conversations and strategy sessions with his attorneys, the presentation of evidence at the reverse proffer, and his own review of the evidence, it is clear that Meszaros was made aware of the weaknesses in his case.

Meszaros was also aware of the different sentences to which he could be exposed. Meszaros was present at the reverse proffer in May 2007 when the various sentencing alternatives—the two possible plea agreements and Meszaros's exposure of 235 to 293 months under the Guidelines—were discussed. (*See, e.g.*, Resp't's Exs. 4, 6.) Both Brissenden and AUSA Bode's notes from the meeting clearly indicate that these topics were addressed. (*See id.*)

The attorneys also credibly testified regarding their discussions with Meszaros concerning the Guidelines and sentencing. Brissenden stated that "there was definitely a discussion about how the Guidelines worked. There were discussions about the Court's discretion to go above or below the Guidelines. . . . [A]nd certainly in the context of discussing these numbers, we would have gone through the Guidelines calculation [provided by the government]." (Hr. Tr. 195:4-10.) Brissenden further stated that "we had the backdrop of the Government's Guideline calculation in forming the discussion we were having. So we were aware [that] the Government was advocating a Guideline sentence if he should be convicted at trial." (Hr. Tr. 201:8-16.) Scaring also credibly testified that, as they got closer to trial, he also talked "generally" about the fact that Meszaros would face "significant" jail time if he were convicted at trial.[21] (Hr. Tr. 160:23-161:1.)

Nevertheless, Meszaros argues that his attorneys "failed to adequately advise him, and to provide to him the benefit of their professional advice, on the crucial question of whether to proceed to trial or to plead guilty." (*See* Movant's Post Hearing Mem. 1, ECF No. 242 (06-cr-503).) Counsel is not *per se* required to make an explicit recommendation on whether the client should accept a plea.[22] *See Purdy*, 208 F.3d at 46.

---

[21] During his cross-examination, Scaring testified that he estimated that Meszaros would be sentenced to between six and eight years if convicted at trial (*see* Hr. Tr. 160:13-161:8); Meszaros was ultimately sentenced to 151 months. Although Scaring's prediction proved to be inaccurate, Meszaros's attorneys advised him "about how the Guidelines worked" and about "the Court's discretion to go either above or below the Guidelines," and he was also aware of his maximum sentencing exposure and the holes in his defense. Thus, Scaring's underestimation of Meszaros's eventual sentence cannot substantiate an ineffective assistance claim. *See, e.g.*, *Vaknin v. United States*, No. 08-CV-02420 DGT, 2010 WL 3394659, at *19 (E.D.N.Y. Aug. 23, 2010) (counsel who inaccurately predicted his client's sentence was not ineffective where he also advised his client that the court could impose a greater sentence and informed the defendant about his maximum potential exposure); *see also Pena v. United States*, No. 09-CR-0341 (VM), 2016 WL 3659114, at *5 (S.D.N.Y. June 27, 2016) ("Errors in counsel's predictions of a defendant's ultimate sentence under the Sentencing Guidelines generally do not support a determination of ineffective assistance of counsel."); *Colotti*, 2012 WL 1122972, at *14 ("[A]n inaccurate prediction as to the sentence a defendant is likely to receive after trial should only rarely be susceptible to an ineffective assistance claim." (citing *United States v. Sweeney*, 878 F.2d 68, 70 (2d Cir. 1989))); *Varone v. United States*, No. 09-CV-5703 DLI, 2012 WL 252845, at *4 (E.D.N.Y. Jan. 26, 2012) (refusing to withdraw a guilty plea where the attorney incorrectly predicted the defendant's sentence, explaining "a mistaken estimate of [the defendant's] likely sentence . . . [is] insufficient to support a claim for ineffective assistance of counsel." (quoting *Goldberg v. United States*, 100 F.3d 941 (2d Cir. 1996))).

[22] In *Boria v. Keane*, 99 F.3d 492 (2d Cir.), *decision clarified on reh'g*, 90 F.3d 36 (2d Cir. 1996), the Second Circuit held that, in certain circumstances, an attorney may be ineffective for failing to explicitly advise his client to take a plea. However, the facts in *Boria* are materially different from those presented here, and therefore, *Boria*'s holding does not control

In *Purdy*, for example, the Second Circuit concluded that it was reasonable for counsel not to "specifically and explicitly" advise his client whether he should accept the plea offer where the attorney had repeatedly advised his client on the strength of the government's case, advised his client on the likely sentence he would face after trial, and his client steadfastly maintained his innocence. *Id.*

When asked whether he advised Meszaros that "based on the problematic nature of the evidence that it would be in [Meszaros's] best interest to take a plea," Brissenden credibly testified, "Yes. I think that's fair to say. I don't know that we used that phrase, but I --- certainly that was what we were trying to convey to Mr. Meszaros." (Hr. Tr. 205:2-7.) Scaring also provided the following credible testimony:

> Q. Was there any discussion with Mr. Meszaros at that time as to whether or not a plea offer of 51 to 63 months, now that you had received the superseding indictment, was a reasonable offer and something that he should consider?
> A. No. Mr. Meszaros said he was not guilty, had a story for everything in the indictment.
> Q. Did you provide him with the benefit of your professional advice as to whether or not the pleas that were being offered were reasonable?
> A. No. What I said to him was, if you want to plead guilty, you have to admit you are guilty. That's the only way it goes and that isn't what he said it was.
> Q. Did you explain, to the extent reasonably necessary to permit him to make an informed decision, regarding

---

the outcome here. There, the government offered the defendant a plea bargain whereby he would receive a sentence of one to three years in prison, but the defendant refused the offer, and after trial, received a prison term of twenty years to life. *Boria*, 99 F.3d at 494. The defense counsel did not "in any way or at any time discuss[] . . . the advisability of accepting or rejecting the offered plea," confining his discussions with Boria to trial strategy, even though he personally believed that rejection of the plea offer would be "suicidal." *Id.* at 495. He rationalized his approach based on his client's repeated assertions that he did not want to plead guilty because it would embarrass him in front of his children. *Id.* at 496.

In contrast to the attorney in *Boria* who provided his client no advice on how to deal with the offered plea bargain, *id.* at 498, here, counsel expressly advised Meszaros on the strength of the government's case. *See Purdy*, 208 F.3d at 47 (distinguishing *Boria* on the same grounds); *Ramos v. United States*, No. 01CR217SCR, 2007 WL 3071185, at *3 (S.D.N.Y. Oct. 18, 2007) (same). Additionally, unlike the defendant in *Boria*, for whom it would have been "suicidal" to proceed to trial (he was apprehended during a "buy and bust"), the same was not true for Meszaros, given the complexity of the facts and law and that the outcome at trial would depend in large part on the jury finding the cooperating defendants' testimony credible. *See Mazique v. Ercole*, No. 06-CV-1723(NGG), 2008 WL 2884370, at *11 (E.D.N.Y. July 23, 2008) (distinguishing *Boria* where the "evidence was not so overwhelming that a victory at trial was completely unrealistic"). Finally, it is not clear that the client in *Boria* actually maintained that he was innocent (or merely opposed pleading guilty because he did not want to be embarrassed in front of his children); however, Meszaros's attorneys testified that Meszaros was not interested in a plea agreement because he claimed he was not guilty. *See Berry v. Ercole*, No. 06 CIV. 6957 (DLC), 2009 WL 1321906, at *12 (S.D.N.Y. May 12, 2009) (counsel was not ineffective for failing to advise the defendant that he should plead guilty where the defendant adamantly denied his guilt and had been informed of the risk of conviction and his sentencing exposure), *aff'd*, 391 F. App'x 87 (2d Cir. 2010).

how to proceed with this case
--
A. Yes.
Q. -- the analysis of his case and the plea offer?
A. I gave him an informed decision as to how to proceed with the case.

(Hr. Tr. 158:9-159:4.)

Although this testimony indicates that there may have been limited attention paid to the question of a plea agreement,[23] it appears that, when the 51- to 63-month plea agreement was offered in May 2007, there was little point in discussing it at length because Meszaros maintained that he was innocent and wanted to go to trial. As Scaring testified, "[w]e never got to the point where there was ever any discussion about taking a plea. Mr. Meszaros never would allow it. He didn't want to take a plea, period." (Hr. Tr. 161:24-162:1.) As issues with his defense arose in preparation for trial, his attorneys tried to convey to him that a plea might be in his interest; however, they were also trying to avoid "the Charybdis of coercing a plea" from their client who resolutely maintained his innocence.

"[T]he law affords counsel broad discretion in choosing 'how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea.'" *Colotti*, 2012 WL 1122972, at *14 (quoting *Purdy*, 208 F.3d at 45). Moreover, "[c]ounsel rendering advice in this critical area may take into account . . . whether the defendant has maintained his innocence." *Purdy*, 208 F.3d at 45. Here, Meszaros consistently professed his innocence and expressed no interest in pleading guilty. Accordingly, his attorneys were mindful not to pressure him to plead guilty, but provided the required advice concerning the weaknesses in his defense and his maximum sentencing exposure. Thus, the Court cannot say that his counsel was ineffective. *See Rivera v. United States*, No. 10-CR-316 (KBF), 2016 WL 1064605, at *6 (S.D.N.Y. Mar. 14, 2016) (counsel provided effective advice by "informing the defendant of the terms of the plea offer, the strengths and weaknesses in the case against him, and the alternative sentences to which he would most likely be exposed"); *Mitchell v. Rock*, No. 11-CV-2642 JG, 2013 WL 4041545, at *19 (E.D.N.Y. Aug. 9, 2013) (upholding decision that counsel had performed effectively, despite the defendant's argument that counsel failed to give his professional

---

[23] However, this case is not like those in which counsel has been found ineffective because he or she failed to offer *any* advice concerning a plea offer, for instance because the attorney had a policy against opining on such agreements. *Compare Carrion v. Smith*, 644 F. Supp. 2d 452, 468-69 (S.D.N.Y. 2009) (finding, under the particular circumstances of the case, counsel ineffective who "had a strict 'no advice' policy, according to which he did not advise his clients as to the advisability of taking a plea, even when it is in their best interests to do so" and engaged in only one conversation regarding the plea with the defendant, who had a limited understanding of the English language and the justice system), *aff'd*, 365 F. App'x 278 (2d Cir. 2010); *Young v. Zon*, 827 F. Supp. 2d 144, 158 (W.D.N.Y. 2011) (finding attorney ineffective based on his "absolute lack of advice" to the defendant

concerning the plea offer). Here, no such policy existed; Meszaros was a sophisticated defendant, who was in frequent contact with this attorneys, and any limitation on the discussion of the plea offers appears to have been as a result of a lack of interest on the part of the client, not because of the carelessness or indolence of the attorneys. *Compare Fulton v. Graham*, 802 F.3d 257, 266 (2d Cir. 2015) (remanding for further proceedings on issue of counsel's efficacy where defendant proceeded to trial after rejecting a plea offer because he was unable to discuss the facts or evidence with counsel and counsel "failed to discuss the pros and cons of accepting the plea offer, including the weaknesses in the defense and that the evidence of guilt was overwhelming," despite the defendant's interest in accepting a plea).

opinion on whether plea should be accepted, by "touch[ing] upon critical factors a defendant must consider when weighing such a decision, including his minimum and maximum sentencing exposure, the evidence the state would present at trial, and the amount of time [the defendant] had already served"); *Munoz*, 2012 WL 666783, at *6 (concluding counsel's performance was effective where he discussed the Sentencing Guidelines with [the defendant] and advised [the defendant] he could receive as much as 97 to 121 months if convicted; he advised [the defendant] as to the options of cooperating, pleading guilty, and going to trial; and he weighed the strengths and weaknesses of the Government's case and the evidence against [the defendant], leaving to his client the ultimate decision whether to plead"); *see also United States v. Pitcher*, 559 F.3d 120, 125 (2d Cir. 2009) (noting that defense counsel has no duty to "arm-twist a client who maintains his innocence into pleading guilty"); *Diallo v. United States*, No. 12 CIV. 3310, 2014 WL 4460364, at *4-5 (S.D.N.Y. Sept. 10, 2014) (holding that it was not unreasonable for counsel not to pursue plea offer with the government where the defendant repeatedly professed his innocence); *Martin v. Conway*, 764 F. Supp. 2d 545, 551 (W.D.N.Y. 2011) (explaining that if the attorney "had failed to explain the sentencing exposure [the defendant] faced upon a guilty verdict and the demonstrable weaknesses in the defense case, he would have been derelict in his duties").

Based on the evidence, "it appears the problem in this case was not that [Meszaros's] counsel was unreasonable but that [Meszaros] either misconstrued or ignored [their] advice." *Ramos*, 2007 WL 3071185, at *2. Finally, even if Meszaros's attorneys' performance had been inadequate, his ineffective assistance claim would nevertheless fail because, as described below, he cannot show he was prejudiced by the allegedly deficient representation.

## B. Prejudice Prong

As noted above, "[t]o show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Frye*, 132 S. Ct. at 1409.

As proof that he would have accepted the plea offer had he known or been adequately counseled about it, Meszaros points to the disparity between the 51- to 63-month sentence in the plea offer and his 151-month sentence (as well as his 235- to 293-month Guidelines range), and argues that he never would have turned down a five-year plea offer in the face of a twelve-year sentence.

It is true that the sentence offered in the plea is significantly less than the sentence imposed,[24] and in some cases, such a disparity "is sufficient to support a prejudice finding." *Pham*, 317 F.3d at 182. However, such a conclusion is not mandated where, as here, the Court determines that the defendant's assertions that he would have accepted the plea are not credible. *See, e.g.*, *Frederick*, 526 F. App'x at 93 (although there was a significant disparity between the

---

[24] There is no "magic formula" for calculating whether the difference between two sentences is sufficiently disparate. However, given that the imposed sentence is just under three times the low end of the range offered in the plea agreement, the two sentences would appear to be sufficiently disparate, based on case law from this Circuit. *See, e.g.*, *Pham*, 317 F.3d at 183 (finding sufficient disparity where the sentence imposed was "more than double" the plea).

sentence imposed and the sentence the defendant would have received pursuant to the plea agreement, the defendant failed to show that he was prejudiced by his attorney's allegedly ineffective advice because the court did not believe that he would have accepted the plea, given that he was adamant that he wanted to go to trial). After considering the hearing testimony, the parties' submissions, and the Court's own observations during the trial, the Court concludes that Meszaros's assertion that he would have accepted the 51- to 63-month plea offer had he been aware of it or been properly advised is not credible.

First, Meszaros has consistently and unequivocally asserted his innocence. Scaring and Brissenden repeatedly asserted that Meszaros genuinely believed that he was innocent and was not receptive to evidence to the contrary. Scaring credibly testified that, "[Meszaros] never, ever said to us that he had committed any crime" (Hr. Tr. 144:2-4), and that "Mr. Meszaros was adamant in maintaining his innocence, despite what we viewed as problematic evidence" (Hr. Tr. 186:24-187:1). Scaring further recalled that they attempted to confront Meszaros with issues or discrepancies with the evidence, but that it was "very difficult because [Meszaros] was not buying anything. He would spin the evidence. He had a view of what his defense was. He believed it." (Hr. Tr. 129:7-10.) Meszaros's intransigence on this topic undermines his attempt to argue that he would have accepted a plea. *See, e.g.*, *Shi Yong Wei*, 2013 WL 980151, at *5 (rejecting the petitioner's contention that he would have accepted a plea offer, as it was "squarely contradicted" by his attorney's testimony that his client was "'adamant . . . that he would

not plead guilty'"); *Vargas*, 951 F. Supp. 2d at 550, 553 ("[The defendant's] claim of prejudice is further undermined by the fact that he asserted his innocence through his trial and sentencing, and continued to proclaim innocence at the evidentiary hearing."); *Muyet*, 2009 WL 2568430, at *5 (concluding that defendant had not shown prejudice where the record contained "no indication that [the defendant] would have admitted guilt, as he maintained his innocence throughout the trial," even though defendant submitted an affidavit swearing that he would have accepted a twenty-year plea offer had counsel properly informed him that his sentence exposure if convicted was eight life sentences plus 130 years); *Kagan v. United States*, No. 02 CIV. 3886(DLC), 2003 WL 21991585, at *4 (S.D.N.Y. Aug. 20, 2003) (defendant's inability to indicate an "'unequivocal willingness to plead guilty'" was incompatible with his suggestion that he would have pleaded guilty (quoting *United States v. Feyrer*, 333 F.3d 110, 120 (2d Cir. 2003))); *Gluzman v. United States*, 124 F. Supp. 2d 171, 177 (S.D.N.Y. 2000) (observing that "it is difficult to see how [the defendant] could pleaded (sic) guilty since her persistent claims of innocence would have rendered highly problematic her ability adequately to allocate").

In fact, even during the evidentiary hearing, conducted in part for Meszaros to establish that he would have accepted a guilty plea, Meszaros would not admit that he was guilty, allowing only that he "would have had no choice" but to plead guilty if he had known that he would be sentenced to 151 months.[25] (*See* Hr. Tr. 80); *see Logiudice v. United States*, No. 01CV88(SJ), 2008 WL

---

[25] While the Second Circuit has recognized that a defendant's protestations of innocence are not necessarily dispositive because a defendant confronted with a "significant difference between the likely sentencing ranges after trial and under the offered plea bargain . . . might well . . . abandon[] his claim of innocence," *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999), Meszaros has demonstrated no such ability to relinquish his claim that he is not guilty.

835714, at *10 (E.D.N.Y. Mar. 28, 2008) (defendant's claim that he would have pleaded guilty if he had known of plea offer was not credible given that he consistently maintained his innocence, and, even during a hearing before the court, where the "primary purpose was to convince the court that he would have pled guilty had his counsel advised him appropriately," he was "evasive about his guilt").

Relatedly, Meszaros was adamant that he wanted to go to trial and expressed no interest in taking a plea, even when encouraged by his attorneys, confronted with damaging evidence, and despite the fact that he knew he faced a significant sentence if convicted at trial. As Brissenden credibly noted, "we were trying to sort of pressure him all along to consider taking a plea[,] [b]ut those conversations didn't really go anywhere" (*see* Hr. Tr. 206:3-6), and "there was never the slightest inclination on the part of our client to go down that road" (Hr. Tr. 205:11-14). He further credibly testified that, even after the meeting with Ms. Meszaros, where he and Scaring attempted to lay out all of the damaging evidence, Meszaros still remained committed to trying the case. (*See* Hr. Tr. 187.) Scaring credibly explained that "[w]e never got to the point where there was ever any discussion about taking a plea. Mr. Meszaros never would allow it. He didn't want to take a plea, period. So that wasn't our primary focus." (Hr. Tr. 161:24-162:2.) Meszaros's apparent resolve to try his case further weakens the credibility of his assertion that he would have accepted a deal. *See, e.g.*, *Pierre v. United States*, No. 06-cv-1573(NGG), 2008 WL 3992152, at *8 (E.D.N.Y. Aug. 22, 2008) (concluding that petitioner had not shown that he would have pleaded guilty where he insisted on going to trial, even after being warned of his sentencing exposure after conviction); *Mickens*, 2005 WL 2038589, at *5 (relying,

in part, on attorney's testimony that his client was not interested in taking a plea in concluding that client would not have accepted plea offer if he had been properly advised), *aff'd*, 257 F. App'x 461 (2d Cir. 2007); *United States v. Crisci*, No. 00 CR. 253 (DC), 2003 WL 22845669, at *3 (S.D.N.Y. Dec. 1, 2003) (refusing to credit defendant's assertion that he would have accepted guilty plea where he was insistent on going to trial and was adamant that he was innocent), *aff'd*, 108 F. App'x 25 (2d Cir. 2004); *United States v. Peterson*, 233 F. Supp. 2d 475, 493 (E.D.N.Y. 2002) (defendant could not prove that he would have accepted a plea offer involving incarceration where he was "resolved to go to trial," despite the fact that he was aware of the weaknesses in his defense and his potentially significant sentence upon conviction); *see also Herzog v. United States*, 38 F. App'x 672, 675 (2d Cir. 2002) (holding that district court's conclusion that defendant would not have accepted plea offer was not clearly erroneous where defendant, *inter alia*, never showed any inclination toward accepting a plea); *Miller v. McNeil*, No. 09-60566-CIV, 2010 WL 2639591, at *7 (S.D. Fla. May 7, 2010) (defendant could not establish prejudice under *Strickland* in light of his statement indicating his intent to go to trial and the absence of any objective evidence indicating a desire to plead guilty), *report and recommendation adopted*, No. 09-60566-CIV-COHN, 2010 WL 2613320 (S.D. Fla. June 29, 2010).

Having observed Meszaros during the trial and evidentiary hearing and, in light of the attorneys' credible testimony, the Court concludes that Meszaros was unable or unwilling to accept that he was guilty. The Court does not credit his assertion that he would have accepted the government's plea offers and, therefore, concludes that he has failed to establish prejudice.

Because Meszaros has not satisfied his burden to show that his counsel was ineffective or that he suffered prejudice as a result of any allegedly deficient advice, his claim for ineffective assistance of counsel must fail.

## VII. CONCLUSION

For the foregoing reasons, Meszaros's motion to vacate his conviction under Section 2255 is denied. The Clerk of the Court is requested to enter judgment and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 15, 2016
       Central Islip, New York

\*       \*       \*

Meszaros filed the petition *pro se*; appointed counsel, Gary Schoer, Esq., 6800 Jericho Turnpike, Syosset, NY 11791, represented Meszaros during the evidentiary hearing and related briefing. The government is represented by Allen Lee Bode, United States Attorney's Office, Eastern District of New York, 610 Federal Plaza, Central Islip, NY 11722.